IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| JAMES DURST | : | CIVIL ACTION |
|---|---|---|
| v. | : | No. 17-2933 |
| CITY OF PHILADELPHIA | : | |

**MEMORANDUM**

**Juan R. Sánchez, C.J.**                                                                                           September 21, 2018

Plaintiff James Durst brings this employment discrimination action under Title VII of the Civil Rights Act of 1964 (Title VII) against his former employer, the City of Philadelphia, alleging the City unlawfully terminated him because of his race.[1] The City has moved for summary judgment on all counts of Durst's Complaint. Because there are no genuine disputes as to any material facts and because the City is entitled to judgment as a matter of law, the City's Motion for Summary Judgment will be granted.

**FACTS**[2]

Durst, a Caucasian male, worked for the City as an inspector in the Licenses and Inspections Department (L&I Department) from September 2011 until his termination on April 28, 2016. Durst began his employment with the City as a Code Enforcement Inspector I in the

---

[1] In his Amended Complaint, Durst also asserted a hostile work environment claim under Title VII, a Fourteenth Amendment equal protection claim pursuant to 42 U.S.C. § 1983, and additional theories of disparate treatment under Title VII. At oral argument, however Durst stated he was no longer pursuing these additional claims and theories. Because Durst has abandoned these additional claims and theories, only Durst's wrongful termination claim under Title VII will be addressed herein.

[2] In determining whether to grant summary judgment, the court "must view the facts in the light most favorable to the non-moving party, and must make all reasonable inferences in that party's favor." *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

West District of the L&I Department, where he Durst was supervised by James Titus, who is Caucasian. In that position, Durst worked from 8:30 a.m. until 5:00 p.m., and was instructed to begin his day by coming into the office for approximately the first two hours of his shift. Durst Dep. 43. Throughout the L&I Department, inspectors were expected to come into the office in the morning to enter appropriate code violations and generate complaints. *Id.* 33, 47. Pursuant to a verbal directive given at a supervisors' meeting around 2013-2014 by Ralph DiPietro, the Deputy Commissioner of the L&I Department, inspectors were not permitted to begin work from the field without obtaining supervisor approval.[3] Fernandez Dep. 18.

On May 5, 2014, Durst was promoted to Code Enforcement Inspector II and transferred to the L&I Department's North District, where he was supervised by Ted Pendergrass, who is African American. Pendergrass also supervised several other inspectors including Steve Bickel, Stacy Jones, and Timothy LaSmith. Pendergrass Dep. 16. Consistent with DiPietro's directive, Pendergrass required all inspectors under his supervision to obtain permission before beginning work from the field. *Id.* at 17. Despite this requirement, Durst did not always obtain permission before clocking in from the field.[4] While working in the North District, Durst would choose "different days to show up and not show up from the field." *Id.* at 24. Pendergrass disciplined Durst twice for starting in the field without authorization. *Id.* at 16. On August 4, 2014, due to Durst's practice of starting from the field without authorization, Pendergrass sent him following email:

---

[3] An inspector begins work from the field by remotely clocking on his or her City-issued laptop through a program called "Stromberg." Fernandez Dep. 14, 15.

[4] Due to a unique parking issue in the North District, some inspectors were required to start their day from the field if they were part of an authorized, predetermined rotation. Jones Dep. 19. This practice, however, began before Durst was transferred to the North District, and he was never added to the rotation, nor did he request to be on it. Pendergrass Dep. 20, 27-28.

> I find it hard to believe since you have been with the Dept. you have never turned in a Daily Work Summary, which is policy to do. I have seen your work summaries in the past and have reminded you to make sure they are turned in daily. . . . They are to be turned in before you leave the office each morning in the office bin . . . . Starting today 8/4/14 you are to return to the office each day one hour and thirty minutes before you sign out (3:30pm) and also sign in from the office. No longer will you start from the field without a supervisor's permission.

Def.'s Am. Mot. for Summ. J. Ex. H. In addition to disciplining Durst for starting in the field, Pendergrass also disciplined Durst's fellow inspector, Martin Dean, who is African American, for starting in the field without permission. Pendergrass Dep. 19.

In mid-October 2015, Durst was transferred to the L&I Department's East District, where he reported to Ela Fernandez, who is Latina. Durst Dep. 60. Durst was transferred to the East District because an investigation by the City's Office of the Inspector General determined he was impermissibly engaging in secondary employment without authorization and should be moved from the North District for closer supervision. At the time, Fernandez supervised a team of seven inspectors.[5] Like Pendergrass, Fernandez required inspectors under her supervision to obtain permission before starting in the field. Fernandez Dep. 13. Specifically, Fernandez required inspectors to come to her a day in advance and explain why they needed to start in the field the following day. Fernandez Dep. 15; Gonzales Dep. 11, 12. Fernandez, however, did not always grant such requests. For example, fellow-inspector Christina Phillips always requested permission before starting in the field, which Fernandez sometimes denied. Phillips Dep. 13, 21-23, 25.

Starting around early December 2015, Bernice Johnson, who is the field operations manager for the L&I Department and African American, began receiving telephone complaints

---

[5] The other inspectors Fernandez supervised were Willie Brown (African American), Terrell Smith (African American), Derick McCall (African American), Gerardo Gonzalez (Latino), Christina Phillips (African American), and Cheri Olah (Caucasian). Fernandez Dep. 9-11.

from property owners and occupants regarding Durst's work. The callers complained that Durst failed to show up for scheduled inspections and wrongly reported properties as violating City code. Over a period of several weeks, Johnson received approximately five to ten such complaints. Johnson Dep. 9, 65. Consistent with her practice of investigating an inspector whenever even a single complaint was received, Johnson began reviewing Durst's work. *Id.* at 6-7. Johnson's review included a field audit, which involved visiting the various properties Durst allegedly had inspected. In January 2016, Johnson informed Fernandez of the complaints she was receiving and requested Fernandez's assistance in monitoring Durst's work.[6]

Johnson found several inconsistencies between Durst's reports and actual property conditions. Johnson Dep. 30. For example, at 3145 Reach Street, Durst listed the property as vacant, when, in fact, the property was occupied. In a similar case, at 324 W. Cambria Street, Durst cited the property as vacant and directed the case to the City's Clean and Seal unit.[7] Def.'s Am. Mot. Ex. P. However, when Clean and Seal employees arrived, they found the property visibly occupied. *Id.* The owner of the 324 W. Cambria Street property also stated he attempted to contact Durst regarding the violation but Durst was "rude and hung up the phone on him." *Id.* In addition, Johnson's investigation yielded eight more improper inspections.[8]

---

[6] Around the same time, Fernandez also began receiving complaints from the public about Durst's performance. Fernandez Dep. 50-51. Fernandez testified she had never received so many complaints at about an inspector before. *Id.* at 52.

[7] Clean and Seal is a City unit that boards up vacant properties. Johnson Dep. 33. Johnson also testified that an inspector would have to inspect and report a property as vacant twice before referring it to Clean and Seal, which meant Durst was either filing incorrect reports for properties multiple times or not visiting properties at all. *Id.*

[8] The following improper inspections were also found: 230 West Wensley St. (improperly closing a case as unsubstantiated where an auto body shop was visibly operating without proper zoning); 529 East Allegheny Ave (improperly reporting a store as unlicensed); 3222 Hurly St. (improperly listing the property as vacant); 2853 North 4th St. (improperly reporting a three-

In the same timeframe, Durst was continuing to start from the field without prior permission, despite his awareness that permission was required. Durst Dep. 45-46; Fernandez Dep. 20-23. For example, on January 25, 2016, Durst emailed Fernandez at 1:57 p.m., more than five hours after his shift began, stating he started in the field at 8:30 a.m. that day. That same month, Fernandez reminded Durst he needed to request permission before beginning work in the field. Fernandez Dep. 16-18, 24. With Durst continuing to start from the field and emailing Fernandez later in the day, Fernandez began forwarding Durst's emails to Johnson. *Id.* at 44, 52. Fernandez did not reply to Durst's emails because she believed he should have known better as a senior inspector.[9] *Id.* at 21.

After concluding her investigation, Johnson determined Durst had falsified numerous inspection violations, accompanying route sheets, and other City documents. Johnson subsequently reported her concerns and the results of her investigation to Deputy Commissioner DiPietro, who was also the City's Integrity Officer. On February 9, 2016, DiPietro emailed Human Resources Administrator Kirk McClarren stating Durst was not conducting actual inspections, which rendered him "a danger to the public and the Department." Def.'s Am. Mot. Ex. P. DiPietro urged human resources to "get him out of the field." *Id.*

Based on DiPietro's email, Human Resources sent Durst a letter informing him of the allegations against him and notifying him of an upcoming disciplinary hearing. Def.'s Am. Mot. Ex. O. The notice informed Durst that his conduct was alleged to be in violation of Section 10-

---

story boarding house operating without proper zoning as a two-story building); 3126 Kensington Ave (improperly reporting the property as vacant); 632 Wensley St. (reporting an inspection of the property but the owner and occupant stated no inspector visited); 3128 Kensington Ave (failing to report an open access panel posing an immediate danger to the public); and 646 E. Lippincott (improperly listing the property as vacant). Def.'s Mot. Ex. P.

[9] Durst's Notice of Dismissal lists five times he started from the field without authorization between January 2016 and March 2016. Def.'s Mot. Ex. P.

108 of the Philadelphia Home Rule Charter[10] and his actions warranted dismissal. *Id.* Along with the letter, Durst was provided a copy of all the evidence against him and instructed the hearing would proceed in his absence if he failed to appear. On Monday, March 28, 2016, Durst failed to appear for the hearing, which was conducted without him. Following the hearing, on March 29, 2016, the City served Durst with a 30-day suspension and notice of intent to dismiss. On April 14, 2016, based upon DiPietro's recommendation after the hearing, the City sent Durst a termination letter ending his employment effective April 28, 2016. Def.'s Am. Mot. Ex. P. The City terminated Durst because he violated Section 10-108 of the Philadelphia Home Charter Rule by failing to notify his supervisor before starting work in the field, traveling outside of his authorized district, falsely claiming he never received reimbursement from the City for mileage or training, and falsifying City documents. Pl.'s Mem. of Law in Resp. to Def.'s Mot. For Sum. J. Ex. 1, at 1-3.

Durst subsequently appealed his termination to the Civil Service Commission, Durst Dep. 125, 127, but again failed to appear for the hearing. *Id.* Following a review of the evidence, and after hearing witness testimony, the Civil Service Commission determined "there [was] sufficient, probative, [and] substantial evidence to conclude there was just cause for dismissal." Def.'s Am. Mot. Ex. Q. Specifically, the Civil Service Commission determined there was significant evidence to show Durst consistently and on numerous occasions misrepresented the condition of locations he claimed to have inspected. *Id.* Durst did not appeal the Civil Service Commission's ruling.

---

[10] Section 10-108 of the Philadelphia Home Charter Rule prohibits employees of the City of Philadelphia from engaging in fraud or dishonesty. Pl.'s Mem. Ex. 1, at 1-3.

Durst filed a charge with the Equal Employment Opportunity Commission (EEOC) on August 10, 2016, alleging he was discriminated against because of his race. Durst received his notice of right to bring suit from the EEOC on April 4, 2017, and filed the instant action on June 29, 2017. On August 31, 2017, Durst amended his initial Complaint. On February 2, 2018, the City filed the instant Motion for Summary Judgment, to which Durst opposed. The Court heard argument on the Motion at the final pretrial conference held on September 12, 2018. For the reasons set forth below, the Court will grant Defendant's Motion for Summary Judgment and enter judgment in favor of the City.

**DISCUSSION**

A motion for summary judgment shall be granted "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." *Boykins v. Lucent Techs., Inc.*, 78 F. Supp. 2d 402, 408 (E.D. Pa. 2000) (citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Because Durst has no direct evidence of discrimination by the City, the "*McDonnell Douglas* burden shifting analysis applies to his claims of discrimination under Title VII." *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this framework, Durst bears the initial burden of

establishing a prima facie case of discrimination. *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)). If he establishes a prima facie case of discrimination, the burden shifts to the City, which must articulate a legitimate nondiscriminatory reason for the adverse action. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802). If the City meets this burden, it has successfully rebutted the presumption of discriminatory action created by the prima facie case, and Durst must show the articulated reasons were a pretext for discrimination and not the real motivation for the adverse action. *Id.*

To establish a prima facie case of discrimination under Title VII, Durst must demonstrate (1) he is a member of a protected class, (2) he is qualified for his position, (3) he suffered an adverse employment action, and (4) the circumstances surrounding the adverse action give rise to an inference of unlawful discrimination.[11] *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999). The burden of establishing a prima facie case is not meant to be onerous, as its purpose is simply "to eliminate the most obvious, lawful reasons for the defendant's action." *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999). Nonetheless, a plaintiff must present evidence of each element in order to obtain relief. *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997).

The first three elements of Durst's prima facie case are not in dispute. Durst has not presented evidence, however, from which a jury could reasonably find the circumstances surrounding his termination give rise to an inference of unlawful discrimination. Specifically,

---

[11] Because Durst is Caucasian, his Title VII claim is referred to as a "reverse discrimination" claim. *Stites v. Alan Ritchey, Inc.*, 458 F. App'x. 110, 112 (3d Cir. 2012). The Third Circuit recognizes reverse discrimination claims. *Iadimarco v. Runyon*, 190 F.3d 151, 158 (1999). Unlike other Circuits, however, the Third Circuit does not require a plaintiff in a reverse discrimination case to show "background circumstances" demonstrating that the City is the unique employer who discriminates against the majority. *Id.*

Durst has produced no evidence from which a reasonable jury could find the City treated him less favorably because of his race.

Initially, Durst attempts to meet his burden through comparator evidence, arguing that fellow non-Caucasian inspectors Christina Philips, Gerardo Gonzalez, Stacy Jones, and Hollis Crevelle engaged in similar misconduct but were not disciplined or investigated. To demonstrate an inference of discriminatory intent, a plaintiff may show that similarly-situated persons outside his protected class were treated more favorably. *Crumpton v. Potter*, 305 F. Supp. 2d at 465, 472 (E.D. Pa. 2004). For comparator evidence to be probative of discrimination, however, a comparator must be similar in "all relevant respects*.*" *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x. 220, 222–23 (3d Cir. 2009). This usually requires a showing that the relevant aspects of the plaintiff's employment situation are "'nearly identical' to those of the co-workers that plaintiff alleges were treated more favorably." *Hobson v. St. Lukes Hosp. & Health Network*, 735 F. Supp. 2d 206, 214 (E.D. Pa. 2010). Factors considered in determining whether an employee is similarly situated include whether the employee "dealt with the same supervisor [as the plaintiff], w[as] subject to the same standards, and had engaged in conduct of comparable seriousness to [the plaintiff's] own conduct without such differentiating or mitigating circumstances that would distinguish the employer's treatment of it." *Id.*

First, Durst alleges Phillips (who is African American) and Gonzalez (who is Latino) began work from the field without authorization but were not investigated. Durst presents no evidence to support this assertion, and, in fact, the only evidence in the record refutes Durst's claim. Contrary to Durst's assertions, both Phillips and Gonzalez testified they were required to obtain permission before starting in the field. Phillips Dep. 10-11; Gonzalez Dep. 10-12. Gonzalez testified he never started from the field. Gonzalez Dep. 11. Furthermore, Phillips

9

testified and Fernandez confirmed, she always received permission from Fernandez before starting from the field.[12] Phillips Dep. 11. Durst's unsupported assertion that Phillips and Gonzalez started from the field without permission and were treated more favorably is insufficient to create a genuine issue of material fact. *Warfield v. SEPTA*, 460 F. App'x 127, 130 (3d Cir. 2012) (holding an African–American plaintiff who offered only her own "unsupported assertion" that her comparators had similar deficiencies in their work performance yet were not subject to heightened monitoring could not survive summary judgment).

Second, Durst argues Stacy Jones (who is African American) is a relevant comparator because she falsified City documents but was not investigated or disciplined. The Court disagrees. Durst presents no evidence showing Jones falsified City records or that Pendergrass knew of Jones's alleged falsification of City records, and, in fact, Jones denies ever falsifying records. Jones Dep. 25; Fernandez Dep. 35-36. Moreover, Jones was supervised by Pendergrass at the relevant time, not Fernandez. Durst has thus failed to show Jones is a proper comparator. *Warfield*, 460 F. at 130.

Third, Durst argues that Hollis Crevelle (an African American inspector) is a relevant comparator because he was not investigated or disciplined even though he was a registered Megan's Law offender and inspected homes with children inside. Crevelle is not a relevant comparator because (1) his infractions are not sufficiently similar to Durst's to be a relevant comparator; and (2) Durst only provides his own unsubstantiated belief that Crevelle engaged in misconduct. As noted above, to be a comparator, an employee must engage in similar conduct to the plaintiff. *Hobson*, 735 F. Supp. 2d at 214. Here, Durst's misconduct of falsifying City

---

[12] Durst also asserts there is a discriminatory inference because Fernandez would respond to Phillips's emails about starting in the field, but would only forward his to Johnson without responding. This is an improper comparison, however, as the record shows that Phillips emailed Fernandez *before* starting in the field, not hours *after* starting in the field as Durst did.

documents is not similar to Crevelle's alleged violations as an alleged Megan's Law offender. Moreover, Durst admits he does not know the extent of the Megan's Law restrictions placed on Crevelle, nor is there evidence Crevelle violated a City policy. Rather, it is Durst's personal belief that "[Crevelle] should [not] be doing inspections in people's homes." Durst Dep. 225. Consequently, Crevelle is an insufficient comparator to establish an inference of discrimination. *Williams-McCoy v. Starz Encore Grp.,* No. 02-5125, 2004 WL 356198, at *7 (E.D. Pa. Feb. 5, 2004) ("[A] plaintiff's own assertion of racial animus does not give rise to an inference of unlawful discrimination.").

Moreover, Durst has not provided any other evidence from which a reasonable factfinder could infer that Durst's termination was discriminatory. Durst merely provides his own subjective belief he was discriminated against by the City's non-Caucasian management. Durst's subjective belief, however, is insufficient to survive summary judgment. *See, e.g.*, *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Because Durst failed to identify any relevant comparators or other evidence showing discrimination, Durst cannot establish a prima facie of discrimination.

Even assuming Durst could make out a prima facie case of discrimination, the City has proffered numerous legitimate, non-discriminatory reasons for his termination that he cannot rebut as pretextual. The City terminated Durst because he violated Section 10-108 of the Philadelphia Home Charter Rule by failing to notify his supervisor before starting work in the field, traveling outside of his authorized district, falsely claiming he never received reimbursement from the City for mileage or training, and falsifying City documents. Def.'s Am. Mot. Ex. P. The City has therefore carried its burden to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802.

Because the City carried its burden, Durst can only survive summary judgment by producing "some evidence, direct or circumstantial, from which a factfinder would reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Jones*, 198 F.3d at 413.

Durst asserts the City's legitimate, non-discriminatory reasons set forth in his termination letter are false based on the "cat's paw" theory. The cat's paw theory provides that unlawful discrimination occurs when a biased subordinate, lacking decision-making authority, uses the formal decision-maker as a dupe in a scheme to trigger a discriminatory employment action. *Abramson v. William Patterson Coll. of N.J.*, 260 F.3d 265, 287 (3d Cir. 2001). Durst argues Fernandez and Johnson exhibited racial animus toward him and fed misinformation to DiPietro, who referred the matter to Human Resources for termination.

Initially, there is no evidence Fernandez exhibited racial animus towards Durst. As Durst's supervisor, Fernandez reported up the chain-of-command that Durst was engaging in misconduct by continually starting in the field and the complaints she received from the public about Durst. Fernandez Dep. 44, 50-52. There is no evidence Fernandez declined to report other employees for similar infractions. On the contrary, Fernandez stated she had never before received the volume of complaints she received about Durst about any other inspector. Aside from Durst's subjective belief, the record is devoid of evidence showing a racial animus on behalf of Fernandez.

Next, Durst argues Johnson exhibited racial animus toward him by not interviewing him when she conducted her audit, citing *Mastro v. Potomac Electric Power Co.*, 447 F.3d 843 (D.C. Cir. 2006). In *Mastro*, a Caucasian plaintiff was terminated by his African-American supervisor

for allegedly lying to management about why his subordinate employee was not present at work when the employee was incarcerated. *Id.* at 842. The case involved a "he-said, she-said" dispute, centering on when the plaintiff learned about his subordinate's incarceration. *Id.* The plaintiff was terminated after his supervisor interviewed several other employees except him. *Id.* at 855. This supervisor's investigation relied heavily on the statement of another African-American employee the plaintiff supervised. *Id.* The interviewed employee stood to gain substantially if disciplinary action were taken against the plaintiff and had previously physically accosted the plaintiff. *Id.* The court held the plaintiff proffered sufficient evidence of pretext to survive summary judgment because (1) it was a critical error for the supervisor not to interview the plaintiff when the issue involved the plaintiff's unrecorded statements; and (2) the supervisor's investigation was faulty because he failed to properly consider the credibility of the witnesses. *Id.* at 855-56.

Durst's reliance on *Mastro* is misplaced. Unlike *Mastro* where the subject of the investigation was the plaintiff's unrecorded and controverted statements, here, Durst's misconduct was objectively verifiable and documented through his own emails and Johnson's field inspections—which involved photographing inspection sites, interviewing property owners and occupants, and reviewing City documentation. Furthermore, unlike *Mastro*, there is no evidence showing Johnson's investigation was faulty. Johnson initiated an investigation due to numerous complaints about Durst as was her practice, enlisted the help of Durst's direct supervisor, and properly reported her findings to DiPietro as the Integrity Officer, which resulted in a full disciplinary hearing and subsequent Civil Service Commission appeal. Accordingly, because there is no evidence of racial animus on behalf of Johnson or Fernandez, Durst cannot

establish pretext using the "cat's paw" theory.[13] Therefore, Durst's Title VII claim asserting he was discriminated against because of his race fails as a matter of law.

**CONCLUSION**

For the reasons set above, the Court will grant the City's motion for summary judgment and enter judgment in favor of the City on all counts.

An appropriate order follows.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, C.J.

---

[13] Durst also asserts pretext is established because he was terminated for falsifying ten records out of the 600 inspections he estimates he conducted over the relevant period. Pl.'s Mot. Ex. 3. Durst's argument fails because, even considering the number of Durst's violations, falsifying ten records still violates City policy. Accordingly, this argument does not cast doubt on the City's legitimate reasons for firing Durst and cannot establish pretext.